IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JILL KATZ and MICHAEL KATZ, as Administrators of the Estate of SARAH KATZ, Deceased,<br><br>Plaintiff,<br><br>vs.<br><br>PANERA BREAD COMPANY and PANERA, LLC,<br><br>Defendants. | Civil No.: 23-4135 |

**REPORT OF RULE 26(f) MEETING**

In accordance with Federal Rule of Civil Procedure 26(f), counsel for the parties conferred on November 7, 2023, and they submit the following report of their meeting for the Court's consideration:

1. **Discussion of Claims, Defenses, and Relevant Issues**

**Plaintiffs:**

This case involves the preventable death of a bright college junior at the University of Pennsylvania who suffered an arrythmia and cardiac arrest from drinking Panera's Charged Lemonade, which is a dangerous energy drink. Plaintiffs allege this drink did not have proper warnings, was not advertised as an energy drink to its consumers (it contained more caffeine and sugar than 3 Red Bulls combined in its large size), and was dangerous to consumers, including those with pre-existing heart conditions.

Sarah Katz was diagnosed with Long QT Type 1 Syndrome ("LQT1") at age five. In LQT1, the potassium ion channels in the heart do not work properly, disrupting the heart's electrical activity, resulting in potentially life-threatening abnormal heart rhythms (i.e., arrhythmias). Very intense

1

physical exercise, particularly swimming, can trigger arrhythmias in people with LQT1. LQT1 is manageable and responsive to medication. Energy drinks can adversely affect heart rhythms in Long QT patients because they not only contain large amounts of caffeine, but also additional stimulants like guarana; therefore, they should be avoided.

In addition to taking daily medication and following all medical advice, Sarah effectively managed her condition by abstaining from energy drinks. She attended two cardiac appointments a year upon initial diagnosis, which transitioned to one cardiac appointment a year, and always received normal test results. She was also involved in many research studies around the world to maintain her and others' conditions without incident.

On or about September 1, 2022, Sarah obtained an unlimited Panera Sip Club membership, which she subsequently used to purchase Panera Charged Lemonade at the Panera Store located at 200 S. 40th Street, Philadelphia, PA 19104. One of her friends accompanied her to the Panera Store and witnessed her fill up the beverage cup with the charged lemonade. Sarah's roommate also witnessed the remnants of the charged lemonade after her death.

Panera Bread was a brand known to Sarah and advertised itself as a healthier and "clean" fast food chain restaurant for adults and children alike. The retail display of Panera Charged Lemonade was offered side-by-side with all of Panera's non-caffeinated and/or less caffeinated drinks and it was accessible to all people; it was *not* advertised as an "energy drink." It was also part of the Unlimited Sip Club, suggesting to consumers it was safe to have more than one, when it was not safe to have one for some consumers. These unregulated beverages included no warning of any potentially dangerous effects, e.g., the life-threatening effects on blood pressure, heart rate, and/or brain function. Panera Charged Lemonade was advertised as "Plant-based and Clean with as much caffeine as our Dark Roast coffee" in small print and suggests "Sip, ENJOY, Repeat. Unlimited Sip

Club." The drink was not represented as an "energy" drink when, in reality, it contained not only caffeine, but also the stimulant guarana and exorbitant amounts of sugar.

Sarah consumed the Panera Charged Lemonade, reasonably confident it was not an energy drink. On September 10, 2022, following consumption of the Panera Charged Lemonade, Sarah suffered a cardiac arrest in front of her friends. After being transported to Pennsylvania Presbyterian Hospital, she suffered another arrest and was pronounced dead.

Plaintiffs, Sarah's parents, are bringing this suit for defective design, manufacturing, and warnings, with claims of strict product liability, negligence, misrepresentation, breach of express warranty, wrongful death, and survival. Plaintiffs will produce expert testimony in support of these claims. Plaintiffs further reserve the right to clarify and elucidate their claims as investigation continues.

**Defendants:**

Defendants dispute and deny all allegations of wrongdoing or liability.  Defendants deny and dispute any defective design, manufacturing or warnings, any strict liability, negligence, misrepresentation, breach of warranty, wrongful death or survival claims. Defendants further dispute that Plaintiffs can establish general and/or specific causation with the requisite degree of certainty from competent and reliable expert witnesses pursuant to Fed R. Evid. 702 and relevant case law interpreting same.  Defendants will further show that Ms. Katz' death was in no way caused or contributed to by the Panera Charged Lemonade products, but rather was the result of her preexisting long-standing cardiac condition Long QT Type 1 Syndrome, alone or in combination with other alternative causes.

Defendants dispute that Ms. Katz ever purchased, consumed, or was injured in any way by a Panera Charged Sips caffeinated beverage, as alleged in Plaintiffs' Complaint. The Complaint does

not identify any direct physical or documentary evidence of purchase or consumption, nor was the beverage or container she allegedly purchased retained for examination. While Defendants understand that witnesses may report seeing Ms. Katz with a Panera cup and/or going to a Panera café with Ms. Katz, Defendants anticipate that a threshold factual issue exists that Plaintiffs will not be able to meet their burden to prove: whether Ms. Katz ever consumed any caffeinated beverage from Panera at all, and whether Defendants caused or contributed to the death of Ms. Katz in any way or can be held liable to Plaintiffs in this lawsuit.

In addition, Panera anticipates a key factual dispute in this lawsuit will be whether the consumption of one or more Panera Charged Sips beverages proximately caused or contributed to Ms. Katz' cardiac arrest, and whether other alternative causes are the more likely cause of or contributors to her cardiac arrest and death, including her pre-existing cardiac condition, her activities, and any other foods, beverages or substances that she may have consumed. Defendants anticipate that expert support will be required for Plaintiffs' claims and to demonstrate medical causation, and that Plaintiffs will be unable to support such claims or demonstrate medical causation through competent and admissible expert testimony.

Defendants will show that the caffeine content of the Charged Sips beverages was safe for consumption by consumers, was disclosed in numerous ways beyond what any law or regulations required (including through disclosures referenced and demonstrated in Plaintiffs' Complaint), and that the labeling and disclosures of the Charged Sips products was not misleading in any way to Ms. Katz. Defendants anticipate that Ms. Katz' knowledge and understanding of the caffeine content of the Charged Sips products and her awareness and assumption of the risks of consumption of caffeine given her medical conditions will also be disputed and established through discovery. Defendants will also demonstrate their adherence to all applicable legal, regulatory and industry standards in the

development, labeling/disclosures, marketing and sale of the Charged Sips products to Ms. Katz and the public generally.

Defendants also anticipate certain legal issues will be of particular importance in this case, including whether Plaintiffs' claims as pled in the Complaint are compatible with Pennsylvania law for manufacturing defect, design defect, and failure to warn claims, and whether Plaintiffs have pled and can prove the necessary elements of a breach of express warranty claim. Defendants also anticipate that allocation of fault to non-parties and/or to Ms. Katz may be both factual and legal issues in this case, as investigation continues.

Defendants reserve the right to assert further factual and legal defenses as investigation continues and the bases for such defenses may become known to the parties.

2. **Informal Disclosures**

Per the Court's October 27, 2023 Order (Doc. 2), the Parties intend to exchange Rule 26(a) initial disclosures by November 10, 2023. The Parties are working cooperatively to collect Ms. Katz' medical records outside formal discovery procedures.

3. **Formal Discovery**

**Plaintiffs' Position:**

Plaintiffs request the standard 120 days of fact discovery in this matter. At defense counsel's request, Plaintiffs' counsel has already forwarded the materials requested, including Sarah's medical records, witness information, and documents supporting their claims for damages. Plaintiffs will endeavor to continue cooperating with these requests to expedite this litigation. Plaintiffs have agreed to make available witnesses who accompanied Sarah to purchase the charged lemonade and who witnessed the remnants of the charged lemonade after her death.

Respectfully, a prolonged period of discovery will unnecessarily stall litigation. To fully

5

advance their case, Plaintiffs require document production from defense, of which they currently have none. Plaintiffs also anticipate being able to efficiently complete all necessary depositions.

**Defendants' Position:**

Defendants request 240 days of fact discovery in this matter. This is a high-profile wrongful death and products liability case, which is the first of its kind and involves numerous complex factual, legal, regulatory, medical and scientific issues that make it much more complex than an average federal civil matter. A large number of potential party witnesses, fact witnesses, and treating healthcare provider depositions will need to be completed, and certainly many of these depositions will require collection of medical records prior to completion of such depositions. Given the number of depositions, a shorter fact discovery schedule is likely not feasible and would likely result in a later request to the Court for modification of a more truncated discovery schedule.

Defendants anticipate Ms. Katz' cause of death will be an important area of fact discovery, which will require collecting extensive medical records and deposing all medical professionals who cared for her, not only at the time of the incident but previously, given her pre-existing history of long QT syndrome. Defendants are in process of requesting and collecting those records both from providers identified by Plaintiffs and providers who will be identified through discovery, but this record collection will take significant time to complete. The facts surrounding Ms. Katz' death are also complex and will require thorough investigation through formal discovery. Witnesses present with Ms. Katz at the time of her cardiac arrest, emergency personnel who responded on the scene, and those who may have accompanied her to a Panera store will also need to be deposed. Defendants anticipate seeking depositions of Ms. Katz' family, friends, and classmates, and other witnesses who will be important in determining her cause of death and whether she ever purchased or consumed the product alleged to be a contributing cause of her death.

Defendants anticipate that completion of most or all of this fact discovery will be necessary to allow the parties to meaningfully evaluate the potential for settlement in this action, and that a shorter fact discovery period may frustrate the objective of both sides fully evaluating the merits of the case for purposes of conducting settlement discussions and/or mediation.

Defendants anticipate that fact discovery in this action will include extensive electronic document and data discovery and production, including medical records from numerous providers, internal documents from defendants from electronic mail servers, shared drives, databases and other electronic repositories, and will likely also include electronic data from other sources associated with Plaintiffs and third party fact witnesses still to be determined.

Defendants will propose a Confidentiality Order to be agreed upon by the parties and entered by the Court, which will preserve the confidential nature of any internal documents from Defendants and data that would reveal trade secrets, confidential processes and systems, customer sales and pricing data, and other information traditionally protected from public disclosure as well as the confidentiality of Ms. Katz' medical and educational records. The Confidentiality Order will also include a provision for clawback of inadvertent production of privileged or attorney work product-protected documents, data, or information consistent with the Federal Rules.

**4.     Electronic Discovery**

**Plaintiffs' Position:**

Plaintiffs are in receipt of Defendants' Initial E-Discovery Disclosure. Plaintiffs intend to preserve and produce Sarah's computer, phone, and social media as best as possible.

**Defendants' Position:**

Defendants incorporate herein by reference their Initial E-Discovery Disclosure, in which they have disclosed certain potential custodians of electronic documents and data, outlined their

systems and retention policies, explained any potential issues with e-discovery that may be encountered, and identified Beth Toberman as Defendants' E-Discovery Liaison.

     **5.**     **Expert Witness Disclosures**

The Parties jointly propose that Plaintiffs' expert reports be due 30 days after the close of fact discovery, Defendants' expert reports be due 30 days after Plaintiffs' reports, and rebuttal reports due 30 days thereafter. The Parties anticipate the need for expert depositions, and due to the likely large number of expert witnesses to be disclosed by both sides in this action, ask for 60 days in which to complete them after the exchange of rebuttal reports. In the event that too many experts are disclosed to complete the depositions within 60 days, the Parties will approach the Court about modification of the schedule as may be needed to allow completion of expert depositions.

The Parties believe that staggered exchange of expert reports is necessary in a case involving complex issues of medical causation, federal regulation, scientific study, and other areas of expert testimony. Defendants additionally request that the Court including in any Scheduling Order to be entered for expert discovery that no defense expert shall be deposed until at least 7 days after the deposition of the corresponding expert(s) for Plaintiffs. The Parties may also agree, with notification to the Court by the filing of a Stipulation or Agreed Order, to a brief extension of the expert deposition deadline if necessary to comply with staggering of both expert report deadlines and the taking of expert depositions as outlined herein.

     **6.**     **Early Settlement or Resolution**

The Parties are open to early settlement discussions and anticipate engaging in exploration of potential settlement in the near term. The Parties propose an early, private mediation with an agreed-upon mediator.

### 7. Trial Date

**<u>Plaintiffs' Position:</u>**

Plaintiffs agree that this case will be ready for trial approximately 30 days after ruling on dispositive motions. However, Plaintiffs have proposed the typical discovery schedule of 120 days. This would put this case at trial ready by approximately December 30, 2024.

**<u>Defendants' Position:</u>**

Defendants anticipate that this case will be ready for trial approximately 30 days after ruling on Motions for Summary Judgment under Fed. R. Civ. P. 56 and any Motions to Exclude Expert Witnesses under Fed. R. Evid. 702. Based upon the schedule for fact and expert discovery proposed above, these Motions should be filed 30 days after conclusion of expert discovery, or approximately November 15, 2024, with briefing complete and oral argument (if ordered) held by approximately January 15, 2025. Anticipating that any such motions could be ruled upon within 60–90 days of the close of briefing and any oral argument, this would put this case at trial ready by April 30, 2025.

### 8. Other Matters

**<u>Plaintiffs' Position:</u>**

It is again important to note that at Defendants' request, Plaintiffs' counsel has provided a number of requested materials, including Sarah's medical records, witness information, and more. Plaintiffs' counsel has already forwarded all of the materials requested, including the decedent's medical records, witness information, and documents supporting their claims for damages. The only outstanding request that should be produced by the end of the week and prior to the court conference on November 14, 2023 are Plaintiffs' Decedent's cardiology records. Accordingly, Plaintiffs object to the fact discovery period being delayed until after Defendants file an Answer to Plaintiffs' Complaint.

**<u>Defendants' Position:</u>**

Because this matter only began on October 23, 2023 with the filing of the original Complaint in the Philadelphia Court of Common Pleas and investigation is still in its infancy, Defendants have not yet filed a Motion to Dismiss under Fed. R. Civ. P. 8(a) and 12(b)(6), as of the time of submission of this Rule 26(f) Report. That is due on or before November 16, 2023. Because that Motion will remain to be briefed, potentially argued before the Court, and ruled upon, Defendants request that the fact discovery period only commence after the Court rules upon the Motion to Dismiss and, if denied in whole or in part, after Defendants thereafter file an Answer. If the Court orders dismissal with leave to amend, then Defendants request that the fact discovery period commence after Defendants file an Answer to any such Amended Complaint.

Waiting until the scope of claims are known before commencing fact discovery will serve judicial economy and efficiency, because it will allow the parties and the Court to tailor the scope of discovery to the actual claims confirmed to be at issue in this action, and will likely prevent discovery disputes from both sides over proportionality of some topics and types of discovery.

Defendants additionally note that while Plaintiffs have shared certain key medical records informally as of the date of filing of this report, there are additional relevant providers to be identified and records to still be collected, which will be an ongoing process throughout discovery in this lawsuit, and it would be incorrect to suggest that medical records collection or production is complete or nearly complete at this time.

Dated: <u>November 8, 2023</u>  **KLINE & SPECTER, PC**

<u>/s/ Elizabeth A. Crawford</u>
Thomas R. Kline, Esquire
Elizabeth A. Crawford, Esquire
Michelle A. Paznokas, Esquire
1525 Locust Street, 19th Floor
Philadelphia, PA 19102
215-772-1000
tom.kline@klinespecter.com
elizabeth.crawford@klinespecter.com
michelle.paznokas@klinespecter.com

*Attorneys for Plaintiffs*

Dated: <u>November 8, 2023</u>  **GREENBERG TRAURIG LLP**

 <u>/s/ Gregory T. Sturges</u>
Gregory T. Sturges, Esq.
1717 Arch Street, Suite 400
Philadelphia, PA 19103
T 215.988.7820
sturgesg@gtlaw.com

Lori G. Cohen, Esq. (admitted *pro hac vice*)
Sara K. Thompson, Esq. (*pro hac vice* pending)
Marcella C. Ducca, Esq. (admitted *pro hac vice*)
3333 Piedmont Road, Suite 2500
Atlanta, GA 30305
T 678.553.2385
cohenl@gtlaw.com
Sara.Thompson@gtlaw.com
duccam@gtlaw.com

*Attorneys for Defendants Panera Bread Company and Panera, LLC*