**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| JILL KATZ and MICHAEL KATZ, as Administrators of the Estate of SARAH KATZ, Deceased<br><br>     *Plaintiffs*,<br><br>  v.<br><br>PANERA BREAD COMPANY and PANERA, LLC<br>     *Defendants*. | Civil No.: 2:23-cv-04135-TJS |

## CIVIL ACTION – FIRST AMENDED COMPLAINT

Plaintiffs Jill and Michael Katz, as Administrators of the Estate of Sarah Katz, Deceased, by and through their attorneys, Kline & Specter, P.C., file this Amended Complaint and state as follows:

## PARTIES, JURISDICTION, AND VENUE

1. Jill and Michael Katz (hereinafter "Plaintiffs") are adult persons and residents of the state of New Jersey, residing at 23 Half Moon Isle, Jersey City, NJ 07305.

2. Plaintiffs are the mother and father of their 21-year-old deceased daughter, Sarah Katz (hereinafter "Decedent"), a college student at the University of Pennsylvania, who was residing at 3601 Walnut Street Philadelphia, PA 19104 at the time of her death.

3. Plaintiffs file this Wrongful Death and Survival Action in their capacity as Administrators of the Estate of Decedent.

4. Defendant Panera Bread ("Panera Store") is a chain bakery café offering food and beverages at 200 S. 40th Street, Philadelphia, PA 19104, where Decedent purchased the product at issue in this case, Panera Charged Lemonade.

5.     At all relevant times hereto, Panera Store conducted systematic and continuous business activity within Philadelphia County.

6.     Defendant Panera, LLC is a Delaware limited liability company in good standing in the State of Missouri, with its principal place of business and corporate headquarters at 3630 South Geyer Road, Suite 100, St. Louis, Missouri 63127.

7.     Per the Pennsylvania Department of State's Website, Panera, LLC is registered as a Foreign Limited Liability Company in Dauphin County, Pennsylvania.

8.     The Court has personal jurisdiction over Defendants because the acts and/or omissions at issue in this litigation occurred in the city of Philadelphia, Pennsylvania, and Defendants regularly conduct business in Pennsylvania and the city of Philadelphia.

9.     Venue is proper in the Philadelphia County Court of Common Pleas as Defendants regularly conduct business in Philadelphia.

## OPERATIVE FACTS

10.     The preceding paragraphs are incorporated by reference as if fully set forth herein.

11.     Decedent was a 21-year-old University of Pennsylvania student with an exemplary record.

12.     Decedent was studying international relations and health and societies with a minor in East Asian languages and civilizations.

13.     Before coming to the University of Pennsylvania, Decedent received a full merit scholarship to learn Mandarin at the University of Electronic Science and Technology of China in Chengdu, China.

14.    Decedent also worked as a research assistant at the Children's Hospital of Philadelphia and served as a Rep Cap Ambassador with the American Heart Association where she taught CPR in high schools and underserved communities.

15.    Decedent also served as a membership coordinator and CPR training project chair in the Student Committee on Undergraduate Education and was a student leader in the John Marshall Pre-Law Honor Society, a member in Penn Hillel, and was the social chair of Sigma Kappa sorority.

16.    On or about September 1, 2022, Decedent obtained a Panera Sip Club membership.

17.    Decedent used her Panera Sip Club membership to purchase Panera Charged Lemonade at the Panera Store located at 200 S. 40th Street, Philadelphia, PA 19104.

18.    Decedent had been diagnosed with Long QT Type 1 Syndrome (LQT1) at age five.

19.    In LQT1, the potassium ion channels in the heart do not work properly, disrupting the heart's electrical activity, resulting in potentially life-threatening abnormal heart rhythms (arrhythmias).

20.    Very intense physical exercise, particularly swimming, can trigger arrhythmias in people with LQT1.

21.    LQT1 is the most common and is manageable and responsive to medication in most cases.

22.    Because energy drinks have been shown to adversely affect the heart's rhythm in patients with Long QT Syndrome, they should be avoided in Long QT patients.[1]

---

[1] Amandeep Kaur et al., *Energy drink consumption: a rising public health issue*, 23 REV. IN CARDIOVASCULAR MED. 83 (2022); Bishoy Wassef et al., *Effects of energy drinks on the cardiovascular system*, 9 WORLD J. OF CARDIOLOGY 796 (2017); Christian Ellermann et al., *Cardiovascular risk of energy drinks: Caffeine and taurine facilitate ventricular arrhythmias in a sensitive whole-heart model*, 33 J. CARDIOVASCULAR ELECTROPHYSIOLOGY 1290 (2022); Melanie A. Heckman et al., *Caffeine (1, 3, 7-trimethylxanthine) in Foods: A Comprehensive Review on*

23.     In addition to taking daily medication and following all medical advice, Decedent effectively managed her condition by abstaining from energy drinks and highly caffeinated beverages.

24.     Decedent also drank electrolyte drinks, like Gatorade.

25.     The Gatorade logo depicts a heavy black capital letter "G," which stands for the name of the brand, with a sharp orange and red lightning bolt, which represents the energy and power the drink gives through electrolytes, such as potassium and sodium.

26.     Gatorade contains no caffeine but uses a "charged" symbol to represent hydration.

27.     Panera Charged Lemonade also advertised using the term "charged."

28.     In addition to electrolyte enhanced beverages like Gatorade, Decedent was permitted to have reasonable amounts of caffeine but not energy drinks.

29.     Decedent attended two cardiac appointments a year upon initial diagnosis and always received normal test results.

30.     Decedent subsequently attended one cardiac appointment a year and always received normal test results.

31.     Decedent was also involved in many research studies around the world to maintain her and others' conditions without incident.

32.     Friends and family members of Decedent will attest that Decedent followed her physicians' every recommendation in her excellent management of her Long QT Syndrome and never knowingly consumed energy drinks.

---

*Consumption, Functionality, Safety, and Regulatory Matters*, 75 J. OF FOOD SCIENCE R77 (2010); Muhammad A. Mangi et al., *Energy Drinks and the Risk of Cardiovascular Disease: A Review of Current Literature*, 9 CUREUS 1322 (2017); Sahej Baines et al., *Highly Caffeinated Energy Drinks and Genetic Heart Disease-Associated Sudden Cardiac Arrest*, 146 CIRCULATION 12083 (2022).

33.     Panera Bread was a brand known to Decedent and advertised itself as a healthier and "clean" fast food chain restaurant for adults and children alike.

34.     The display of Panera Charged Lemonade at the retail store at 200 S. 40th Street, Philadelphia, PA 19104 was offered side-by-side with all of Panera's non-caffeinated and/or less caffeinated drinks; it was not advertised as an "energy drink."



35.     These unregulated beverages include no warning of any potentially dangerous effects, even the life-threatening effects on blood pressure, heart rate, and/or brain function.

36.     These unregulated beverages reflect no warning of any risks of ingesting these concentrated amounts of caffeine in connection with the stimulants and sugar.



37.    These unregulated beverages contain no advertisement as an "energy" drink and, instead, represent them as "clean" and akin to Panera Dark Roast coffee, when they contain not only caffeine, but also the stimulant guarana and exorbitant amounts of sugar.

38.    Panera Charged Lemonade is advertised as "Plant-based and Clean with as much caffeine as our Dark Roast coffee" in small print and suggests "Sip, ENJOY, Repeat. Unlimited Sip Club."



6

39.     Accordingly, Decedent consumed the Panera Charged Lemonade, reasonably confident it was a traditional lemonade and/or electrolyte sports drink containing a reasonable amount of caffeine safe for her to drink.

40.     On September 10, 2022, following consumption of the Panera Charged Lemonade, Decedent, while with her friends at a restaurant in her apartment building, suffered a cardiac arrest.

41.     After being transported to Pennsylvania Presbyterian Hospital, she had another arrest and was pronounced dead.

**Defective Design**

42.     Defendants design, formulate, manufacture, market, warrant, promote, distribute, and sell to consumers at their retail locations a product called Panera Charged Lemonade.

43.     Defendants sell the Panera Charged Lemonade at one of their retail stores located at 200 S. 40th Street, Philadelphia, PA 19104.

44.     Panera Charged Lemonade is a beverage designed by Defendants that contains the following ingredients: water, caffeinated mango yuzu citrus flavored syrup (water, apple juice concentrate, sugar, citric acid), caffeine, coffee extract (source of caffeine), guarana extract (source of caffeine), acerola powder, ascorbic acid, natural flavor (mango, yuzu, and citrus natural flavors with other natural flavors), beta-carotene (color), and agave lemonade base (water, sugar, lemon juice, lemon juice concentrate, agave, natural flavors).

45.     Many ingredients in the Panera Charged Lemonade are classified as "stimulants" by the Centers for Disease Control, which warns that ingredients for consumption classified as "stimulants" may have dangerous health effects by increasing blood pressure, heart rate, breathing, as well as dangerous effects on the nervous system.[2]

---

[2]     *The Buzz on Energy Drinks*, CENTER FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/healthyschools/nutrition/energy.htm (last visited Jul. 12, 2023).

46.     The caffeine content of the Panera Charged Lemonade ranges from 260 milligrams in 20 fluid ounces (regular size) to 390 milligrams in 30 fluid ounces (large size, Sip Club size).

47.     At 30 fluid ounces, Panera Charged Lemonade exceeds the combined contents of 12 fluid ounces of Red Bull (114 milligrams caffeine) and16 fluid ounces of Monster Energy Drink (160 milligrams caffeine).

48.     The caffeine content of Panera Dark Roast coffee ranges from merely 161 milligrams in 12 fluid ounces (small coffee), 216 milligrams in 16 fluid ounces (medium coffee), and 268 milligrams in 20 fluid ounces (large coffee).

49.     The sugar content of Panera Charged Lemonade ranges from 82 grams to 124 grams of sugar, exceeding the combined contents of both a 12-fluid-ounce Red Bull (27 grams of sugar) and 16-fluid-ounce Monster Energy Drink (54 grams of sugar).

50.     The low end of the sugar content of Panera Charged Lemonade (82 grams of sugar) is equivalent to 20.5 teaspoons of sugar, and the high end (124 grams of sugar) is equivalent to 29.75 teaspoons of sugar.

51.     Panera Charged Lemonade is defective in design because it is a dangerous energy drink.

52.     Defendants knew or should have known that the Panera Charged Lemonade, as designed and formulated, once consumed, could injure children, pregnant and breastfeeding women, and people sensitive to caffeine—including those with underlying heart problems—by causing catastrophic injuries and/or death.

53.     Due to the defective and unreasonably dangerous design of Panera Charged Lemonade, customers were and continue to be at an increased risk of injury while consuming the dangerous beverage.

54.   Due to the unreasonably dangerous and defective design of Panera Charged Lemonade, as described throughout this Amended Complaint, Decedent suffered cardiac arrythmias and ultimately cardiac arrest, which resulted in her death.

## **Defective Manufacturing**

55.   Panera Charged Lemonade is also defectively manufactured because it is mixed in-house by Panera employees.

56.   This manufacturing is inherently dangerous because Panera Charged Lemonade involves mixing unsafe ingredients at certain concentrations.

57.   Knowing this, before and during the marketing and sale of the Panera Charged Lemonade, Defendants knew or should have known that proper quality control for manufacturing and/or mixing the product was crucial to consumer safety, and that permitting their employees to mix the product could result in an increased risk of causing permanent and catastrophic injuries to consumers—especially children, pregnant and breastfeeding women, and caffeine-sensitive individuals (e.g., those with underlying heart problems).

58.   Due to the unreasonably dangerous and defective manufacturing of Panera Charged Lemonade, as described throughout this Amended Complaint, Decedent suffered cardiac arrythmias and ultimately cardiac arrest, which resulted in her death.

## **Defective Warnings**

59.   Defendants also failed to properly warn consumers of their dangerous product, Panera Charged Lemonade.

60.   Defendants did not market, advertise, and sell Panera Charged Lemonade in the store as an "energy drink," which is a drink containing large amounts of caffeine, added sugar, other additives, and stimulants, such as guarana and/or taurine and/or L-carnitine ("stimulants").

61. Instead, Defendants market, advertise, and sell Panera Charged Lemonade as a product that is "Plant-based and Clean with as much caffeine as our Dark Roast Coffee."

62. The fact that Defendants do not specify what size of Panera Dark Roast coffee is akin to a Panera Charged Lemonade makes this representation ambiguous and unhelpful to consumers.

63. Panera Dark Roast coffee has no sugar.

64. Panera Dark Roast coffee's only ingredient is "Arabica Coffee."

65. Panera Charged Lemonade does not declare the total quantity of caffeine from all sources on the container itself—rather, it merely compares it to an unspecified size of Panera Dark Roast coffee, a beverage which does not contain the added stimulants of sugar and guarana.

66. Panera Charged Lemonade contains the stimulant guarana as another source of caffeine content.

67. Panera Charged Lemonade is a juice beverage marketed to children and adults alike, and it was displayed and offered in Panera stores in the same or similar manner and location in which they offer all other non-caffeinated juice beverages.

68. Consumers are not provided a factual basis for understanding it is an energy drink containing exorbitant amounts of caffeine, caffeine sources, stimulants, and sugar.

69. Panera Charged Lemonade is not in compliance with the labeling or marketing commitments adopted by the American Beverage Association, which is the trade association representing the broad spectrum of companies that manufacture and distribute non-alcoholic beverages, including energy drinks, in the United States.[3]

---

[3]*ABA Guidance for the Responsible Labeling and Marketing of Energy Drinks*, AM. BEVERAGE ASS'N, https://www.energydrinkinformation.com/files/resources/2014-energy-drinks-guidance-approved-by-bod-43020c.pdf (last visited July 17, 2023).

70.     Before and during the marketing and sale of the Panera Charged Lemonade, Defendants knew or should have known that the defective and unreasonably dangerous design of Panera Charged Lemonade could cause catastrophic injuries, including, *inter alia*, heart arrythmias, cardiac arrest, and/or death.

71.     Knowing this, before and during the marketing and sale of the Panera Charged Lemonade, Defendants knew or should have known that (1) proper notice of the product's exorbitant caffeine content was required and (2) that the omission of such consumer notice increased the risk of causing permanent and catastrophic injuries, especially to children, pregnant and breastfeeding women, and caffeine-sensitive individuals (e.g., those with underlying heart problems).

72.     Defendants knew or should have known that displaying the Panera Charged Lemonade in the same manner and location in which Panera offers all other non-caffeinated juice beverage options increased the risk of causing permanent and catastrophic injuries to consumers unaware of the beverages' serious differences.

73.     In addition, Defendants knew or should have known that failing to advertise the Panera Charged Lemonade as an energy drink increased the risk of causing permanent and catastrophic injuries to consumers.

74.     Despite knowing that the design of the Panera Charged Lemonade caused and increased the risk of causing permanent and catastrophic injuries and death, Defendants continued to advertise, market, and sell Panera Charged Lemonade as a safe-for-all beverage.

75.     Defendants even included Panera Charged Lemonade as part of their "Sip Club"—whereby they encouraged Sip Club members to drink unlimited Panera Charged Lemonade every day.

76.     The defective design and manufacturing of the Panera Charged Lemonade caused, increased the risk of harm, and/or was a substantial contributing cause of causing permanent and catastrophic injuries to consumers, including Decedent.

77.     The failure to warn of the risk of severe injury or death to consumers, including Decedent, as described throughout this Amended Complaint, caused, increased the risk of harm, and/or was a substantial contributing cause of causing permanent and catastrophic injuries to consumers, including Decedent.

78.     As set forth more fully below, Defendants engaged in negligent, reckless, intentional, fraudulent, reckless, and/or outrageous misconduct which caused, increased the risk of harm, and/or was a substantial contributing cause of Plaintiffs' and their Decedent's damages which include, but are not limited to, the following:

a.  untimely death at 21 years old;
b.  cardiac arrythmias;
c.  cardiac arrest;
d.  hypoxia;
e.  pain and suffering;
f.  loss of enjoyment of life and life's pleasures;
g.  emotional distress;
h.  disfigurement;
i.  embarrassment;
j.  future lost wages;
k.  loss of future earning capacity;
l.  funeral expenses;
m.  medical expenses;
n.  all damages recoverable under the Survival Act;
o.  all damages recoverable under the Wrongful Death Act; and
p.  all damages as set forth in greater detail in Plaintiffs' Amended Complaint and as permitted by Pennsylvania law.

## COUNT I – STRICT PRODUCTS LIABILITY
### PLAINTIFFS V. ALL DEFENDANTS

79.     Plaintiffs incorporate by reference all the above paragraphs as though set forth fully herein.

80.     At all relevant times hereto, Defendants assumed a duty in strict liability to design and manufacture drinks for consumption without a defective condition, and to warn about the dangers inherent in the drink.

81.     At all relevant times hereto, Defendants knew or should have known of the foreseeable risk of cardiac-related injuries inherent in the design and manufacturing of Panera Charged Lemonade.

82.     At the time Defendants designed, formulated, manufactured, marketed, sold, promoted, and distributed Panera Charged Lemonade, it was defective in its design, unreasonably dangerous, and unsafe for its intended purpose because it did not provide adequate protection and/or warning against the foreseeable risk of cardiac-related injuries and death.

83.     At the time Defendants designed, formulated, manufactured, marketed, sold, promoted, and distributed Panera Charged Lemonade, it was defective in its manufacturing, unreasonably dangerous, and unsafe for its intended purpose because it did not provide adequate protection and/or warning against the foreseeable risk of cardiac-related injuries and death.

84.     The Panera Charged Lemonade at issue was in the same or substantially similar condition as when it left the possession of Defendants.

85.     Neither Plaintiffs nor their Decedent misused or materially altered the Panera Charged Lemonade.

86.     The Panera Charged Lemonade at issue could not be consumed as safely as an ordinary consumer would have expected when consumed in a reasonably foreseeable way, because of, *inter alia*, a lack of quality control in its in-house preparation.

87.   Further, a reasonable person would conclude that the probability and seriousness of harm outweighs the burden or cost of making Panera Charged Lemonade safe and quality controlled.

88.   The Panera Charged Lemonade was defective in one or more of the following respects:

a.   the Panera Charged Lemonade was designed such that it could cause cardiac-related injuries to persons, especially to children, pregnant and breastfeeding women, and caffeine-sensitive individuals;

b.   the Panera Charged Lemonade is manufactured and formulated in-store by employees such that its caffeine content is not controlled and, in turn, has an innate and dangerous potential to vary;

c.   the Panera Charged Lemonade marketing, labeling, and/or packaging misrepresented the beverage as a harmless fruit juice beverage when it is similar to an energy drink;

d.   the Panera Charged Lemonade marketing and/or website misrepresented the beverage's caffeine content as "as much as [their] dark roast coffee," when a large Panera Dark Roast coffee contains 268 milligrams of caffeine, and a large Panera Charged Lemonade has 390 milligrams of caffeine;

e.   the Panera Charged Lemonade was offered without limit as part of the Panera Sip Club membership, even though Defendants knew or should have known of the risks associated with exorbitant caffeine and stimulant consumption;

f.   the Panera Charged Lemonade marketing, labeling, and/or packaging misrepresented the beverage's potential to cause cardiac-related injuries, especially in children, pregnant and breastfeeding women, and caffeine-sensitive individuals;

g.   Defendants failed to adequately inform and warn consumers of the beverage's high caffeine content and related propensity to cause cardiac-related injuries, especially in children, pregnant and breastfeeding women, and caffeine-sensitive individuals;

h.   Defendants designed, formulated, assembled, manufactured, sold, promoted, supplied, and/or distributed a product in a defective condition;

i.   Defendants designed, formulated, assembled, manufactured, sold, promoted, supplied, and/or distributed a product that was unreasonably dangerous to consumers;

j.   Defendants designed, formulated, assembled, manufactured, sold, promoted, supplied, and/or distributed a product which was not reasonably fit, suitable, or safe for its intended and represented purpose;

k.   Defendants designed, formulated, assembled, manufactured, sold, promoted, supplied, and/or distributed a product which could be designed more safely;

l.   Defendants marketed the Panera Charged Lemonade as "safe" and "plant-based";

14

m. Defendants failed to adequately inform and warn consumers that the Panera Charged Lemonade was designed such that it can cause cardiac-related injuries in consumers;

n. Defendants failed to adequately inform and warn consumers that the Panera Charged Lemonade is not a traditional caffeine-free lemonade but rather is akin to an energy drink;

o. Defendants failed to adequately inform and warn consumers that the Panera Charged Lemonade was designed in such a way that it is not safe for consumption by children, pregnant and breastfeeding women, and caffeine-sensitive individuals;

p. Defendants failed to adequately inform and warn consumers that the Panera Charged Lemonade is manufactured and formulated by in-store by employees such that its caffeine content and stimulants are not controlled and, in turn, has an innate potential to vary dangerously;

q. Defendants failed to cease manufacturing or otherwise alter the composition of Panera Charged Lemonade to produce a safer alternative, despite the fact that Defendants knew or should have known that such drinks posed a serious risk of bodily harm to consumers;

r. Defendants failed to conduct post-marketing surveillance to determine the safety of Panera Charged Lemonade;

s. Defendants inaccurately and misleadingly marketed the Panera Charged Lemonade as safe and "clean";

t. Defendants inaccurately and misleadingly marketed offered the Panera Charged Lemonade as a fruit juice beverage, displaying it in the same or similar manner and location in which Panera offers all other non-caffeinated juice beverage options;

u. Defendants inaccurately and misleadingly marketed the Panera Charged Lemonade as an "energy drink" on the Panera website, but not in the store setting;

v. Defendants inaccurately and misleadingly marketed the Panera Charged Lemonade's caffeine content on the Panera website as "as much as [Panera's] dark roast coffee"; and

w. other negligence regarding Panera Charged Lemonade that may be identified during discovery

89. The Panera Charged Lemonade was defective in design, subjecting Defendants to strict liability, in one or more of the following respects:

a. the Panera Charged Lemonade was designed, distributed, and sold such that its quality and caffeine content could not be controlled due to its in-house preparation;

b. Defendants designed, distributed, and sold a product in a defective condition;

c. Defendants designed, distributed, and sold a product that was unreasonably dangerous to consumers;

    d.  Defendants designed, distributed, and sold a product which was not reasonably fit, suitable, or safe for its intended and represented purpose;

    e.  Defendants designed, distributed, and sold a product which could be formulated more safely;

    f.  being otherwise defective as learned through discovery.

90.    The Panera Charged Lemonade was defective in manufacturing, subjecting Defendants to strict liability, in one or more of the following respects:

    a.  the Panera Charged Lemonade was manufactured such that its quality and caffeine content could not be controlled due to its in-house preparation;

    b.  Defendants manufactured and sold a product in a defective condition;

    c.  Defendants manufactured and sold a product that was unreasonably dangerous to consumers;

    d.  Defendants manufactured and sold a product which was not reasonably fit, suitable, or safe for its intended and represented purpose;

    e.  Defendants manufactured and sold a product which could be formulated more safely; and

    f.  being otherwise defective as learned through discovery.

91.    The Panera Charged Lemonade had defective warnings, subjecting Defendants to strict liability, in one or more of the following respects:

    a.  the Panera Charged Lemonade marketing, labeling, and/or packaging misrepresented the beverage as a fruit juice and/or non-caffeinated beverage;

    b.  the Panera Charged Lemonade marketing, labeling, and/or packaging did not indicate it was an energy and/or highly caffeinated drink;

    c.  the Panera Charged Lemonade marketing, labeling, and/or packaging did not explain its potential to cause cardiac-related injuries, especially in children, pregnant and breastfeeding women, and caffeine-sensitive individuals;

    d.  Defendants failed to adequately inform and warn consumers of the beverage's high caffeine content and related propensity to cause cardiac-related injury, especially in children, pregnant and breastfeeding women, and caffeine-sensitive individuals;

    e.  Defendants marketed the Panera Charged Lemonade as "safe" and "plant-based";

    f.  Defendants failed to adequately advertise or otherwise disclose the amount of caffeine in their Panera Charged Lemonade; and

    g.  being otherwise defective as learned through discovery.

92.     Defendants are strictly liable to Plaintiffs and their Decedent for designing, manufacturing, and failing to warn of the dangers of a defective and unreasonably dangerous product.

93.     The defective and unreasonably dangerous condition of the Panera Charged Lemonade was the direct and proximate cause of Decedent's severe and permanent injuries and damages, as previously set forth herein.

94.     Defendants' failure to warn of the substantial dangers and inherent risks of Panera Charged Lemonade's exorbitant caffeine content and stimulants, as well as the inherent risks associated with the reasonably foreseeable use of Panera Charged Lemonade, was the direct and proximate cause of Decedent's injuries and damages, and it increased the risk of harm, as previously set forth herein.

95.     The inherent risks associated with Panera Charged Lemonade outweighed the benefits of its consumption, as a safer alternative design was economically and technologically feasible at the time the product left the control of Defendants.

96.     At all times, Defendants knew there was a high degree of probability of harm to Decedent and acted with a reckless indifference to the potential and foreseeable consequences of Defendants' defective product.

97.     At all times, Defendants knew of the serious harm that could result from their conduct.

98.     Defendants were always aware or recklessly disregarded the likelihood that such serious harm would arise from their conduct.

**WHEREFORE**, Plaintiffs respectfully request judgment in their favor and against Defendants, jointly and severally, including claims for compensatory damages, punitive damages, interest, costs of suit, and such other relief as this Honorable Court may deem appropriate and just.

## COUNT II – NEGLIGENCE
### PLAINTIFFS V. ALL DEFENDANTS

99.     Plaintiffs incorporate by reference all the above paragraphs as though set forth fully herein.

100.    At all relevant times hereto, it was Defendants' duty to use reasonable care in the design, manufacturing, formulation, marketing, sale, promotion, and/or distribution of Panera Charged Lemonade.

101.    This duty required Defendants to ensure that its product did not pose an unreasonable risk of bodily harm to Decedent and all other consumers, and similarly required Defendants to warn of side effects, risks, and dangers associated with the consumption of Panera Charged Lemonade.

102.    At all relevant times hereto, Defendants knew or should have known of the foreseeable risk of cardiac-related injuries inherent in consuming Panera Charged Lemonade.

103.    Defendants breached the duty of care they assume and owe to consumers and were negligent, careless, and reckless in designing, formulating, manufacturing, marketing, selling, promoting, and distributing Panera Charged Lemonade in one or more of the following respects:

    a.  the Panera Charged Lemonade was designed such that it could cause cardiac-related injuries to persons, especially to children, pregnant and breastfeeding women, and caffeine-sensitive individuals;

    b.  the Panera Charged Lemonade is manufactured and formulated in-store by employees such that its caffeine content is not controlled and, in turn, has an innate and dangerous potential to vary;

    c.  the Panera Charged Lemonade marketing, labeling, and/or packaging misrepresented the beverage as a harmless fruit juice beverage when it is akin to an energy drink;

d.  the Panera Charged Lemonade marketing and/or website misrepresented the beverages caffeine content as "as much as [their] dark roast coffee," when a large Panera Dark Roast coffee contains 268 milligrams of caffeine, and a large Panera Charged Lemonade has 390 milligrams of caffeine;

e.  the Panera Charged Lemonade was offered without limit as part of the Panera Sip Club membership, even though Defendants knew or should have known of the risks associated with exorbitant caffeine and stimulant consumption;

f.  the Panera Charged Lemonade marketing, labeling, and/or packaging misrepresented the beverage's potential to cause cardiac-related injuries, especially in children, pregnant and breastfeeding women, and caffeine-sensitive individuals;

g.  Defendants failed to adequately inform and warn consumers of the beverage's high caffeine content and related propensity to cause cardiac-related injuries, especially in children, pregnant and breastfeeding women, and caffeine-sensitive individuals;

h.  Defendants designed, formulated, assembled, manufactured, sold, promoted, supplied, and/or distributed a product in a defective condition;

i.  Defendants designed, formulated, assembled, manufactured, sold, promoted, supplied, and/or distributed a product that was unreasonably dangerous to consumers;

j.  Defendants designed, formulated, assembled, manufactured, sold, promoted, supplied, and/or distributed a product which was not reasonably fit, suitable, or safe for its intended and represented purpose;

k.  Defendants designed, formulated, assembled, manufactured, sold, promoted, supplied, and/or distributed a product which could be designed more safely;

l.  Defendants marketed the Panera Charged Lemonade as "safe" and "plant-based";

m.  Defendants failed to adequately inform and warn consumers that the Panera Charged Lemonade was designed such that it can cause cardiac-related injuries in persons who consume it;

n.  Defendants failed to adequately inform and warn consumers that the Panera Charged Lemonade is not a traditional caffeine-free lemonade such that it is similar to an energy drink;

o.  Defendants failed to adequately inform and warn consumers that the Panera Charged Lemonade was designed in such a way that it is not safe for consumption by children, pregnant and breastfeeding women, and caffeine-sensitive individuals;

p.  Defendants failed to adequately inform and warn consumers that the Panera Charged Lemonade is assembled in-store by employees such that its caffeine content and stimulants are not controlled and, in turn, has an innate potential to vary dangerously;

q.  Defendants failed to cease manufacturing or otherwise alter the composition of Panera Charged Lemonade to produce a safer alternative, despite the fact that Defendants knew or should have known that such drinks posed a serious risk of bodily harm to consumers;

r.  Defendants inaccurately and misleadingly marketed the Panera Charged Lemonade as an "energy drink" on the Panera website, but not in the store setting;

s.  Defendants failed to conduct post-marketing surveillance to determine the safety of Panera Charged Lemonade;

t.  Defendants inaccurately and misleadingly marketed the Panera Charged Lemonade as safe and "clean";

u.  Defendants inaccurately and misleadingly marketed and offered the Panera Charged Lemonade as a fruit juice beverage, displaying it in the same or similar manner and location in which Panera offers all other non-caffeinated juice beverage options;

v.  Defendants inaccurately and misleadingly marketed the Panera Charged Lemonade's caffeine content on the Panera website as "as much as [Panera's] dark roast coffee"; and

w.  other negligence regarding Panera Charged Lemonade that may be identified during discovery

104.    Defendants' negligence, carelessness, and recklessness in designing, formulating, manufacturing, marketing, promoting, and selling Panera Charged Lemonade was the direct and proximate cause of Decedent's injuries and damages, as previously set forth herein.

105.    Defendants knew or should have known that consumers, including Decedent, would accept the material misrepresentations made regarding the nature and safety of Panera Charged Lemonade as true and accurate.

106.    Defendants designed, manufactured, and sold the Panera Charged Lemonade knowing that the product was defective because it contained stimulants causing cardiac arrhythmias and other cardiac-related injuries—especially in children, pregnant and breastfeeding women, and caffeine-sensitive individuals, such as those with underlying heart conditions.

107.    By failing to give Decedent warning of the potential and reasonably foreseeable consequences of using the product and by its material misrepresentations, Defendants acted with wanton and willful disregard of Decedent's health and rights.

108.  At all times, Defendants knew there was a high degree of probability of harm to Decedent and acted with a reckless indifference to the potential and foreseeable consequences of Defendants' defective product.

109.  At all times, Defendants knew of the serious harm that could result from their conduct.

110.  Defendants were always aware or recklessly disregarded the likelihood that such serious harm would arise from their conduct.

**WHEREFORE**, Plaintiffs respectfully request judgment in their favor and against Defendants, jointly and severally, including claims for compensatory damages, punitive damages, interest, costs of suit, and such other relief as this Honorable Court may deem appropriate and just.

## COUNT III – MISREPRESENTATION
### PLAINTIFFS V. ALL DEFENDANTS

111.  Plaintiffs incorporate by reference all the above paragraphs as though set forth fully herein.

112.  At all relevant times hereto, Defendants knew or should have known of the foreseeable risk of cardiac-related injuries inherent in the Panera Charged Lemonade.

113.  Defendants negligently and recklessly misrepresented material facts regarding the safety of the Panera Charged Lemonade in one or more of the following respects:

    a.  marketing the Panera Charged Lemonade as safe and "clean";
    b.  marketing and offering the Panera Charged Lemonade as a fruit juice beverage, displaying it in the same or similar manner and location in which Panera offers all other non-caffeinated juice beverage options;
    c.  inaccurately marketing the Panera Charged Lemonade's caffeine content on the Panera website as "as much as [Panera's] dark roast coffee"; and
    d.  other misrepresentations regarding Panera Charged Lemonade that may be identified during discovery.

114.    Defendants knew or should have known that consumers, including Decedent, would accept the material misrepresentations made regarding the nature and safety of Panera Charged Lemonade as true and accurate.

115.    Defendants knew or should have known that consumers, including Decedent, would rely on the material misrepresentations made regarding the safety of Panera Charged Lemonade when deciding whether to consume it.

116.    Defendants materially represented the nature of Panera Charged Lemonade with the intent to induce consumers, including Decedent, to purchase and consume it.

117.    Decedent justifiably relied on Defendants' material misrepresentations regarding the safety of the Panera Charged Lemonade when deciding to consume it on and before September 10, 2022, as part of her Sip Club membership.

118.    As a direct and proximate result of Defendants' material misrepresentations, Decedent suffered severe injuries and damages from consuming Panera Charged Lemonade in a reasonably foreseeable manner, as previously set forth herein.

119.    At all times, Defendants knew there was a high degree of probability of harm to Decedent and acted with a reckless indifference to the potential and foreseeable consequences of Defendants' defective product.

120.    At all times, Defendants knew of the serious harm that could result from their conduct.

121.    Defendants were always aware or recklessly disregarded the likelihood that such serious harm would arise from their conduct.

**WHEREFORE**, Plaintiffs respectfully request judgment in their favor and against Defendants, jointly and severally, including claims for compensatory damages, punitive damages, interest, costs of suit, and such other relief as this Honorable Court may deem appropriate and just.

### COUNT IV – BREACH OF IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE
### PLAINTIFFS V. ALL DEFENDANTS

122.   Plaintiffs incorporate by reference all the above paragraphs as though set forth fully herein.

123.   Defendants designed, manufactured, marketed, distributed, supplied, and sold its Charged Lemonade with an implied warranty that they were fit for the particular purpose of safe consumption, knowing that consumers would rely on their skill and/or judgment to furnish suitable goods.

124.   Defendants impliedly warranted that, among other things, Panera Charged Lemonade was safe, "clean," and "plant-based" to members of the consuming public, including Sarah Katz.

125.   Defendants impliedly warranted that, among other things, Panera Charged Lemonade had "as much caffeine as a Dark Roast Coffee" when it not only has more caffeine in its large size, but also contains additional stimulants, including guarana, and a high amount of sugar.

126.   Defendants impliedly warranted that Panera Charged Lemonade was a safe lemonade when it is actually a dangerous energy drink.

127.   Defendants impliedly warranted that by having Panera Charged Lemonade as part of their Sip Club membership, it was safe to members of the consuming public to drink refills of their product, including Sarah Katz.

128.     Members of the consuming public, including consumers such as Sarah Katz, were the intended third-party beneficiaries of the warranty.

129.     Defendants breached their duty Plaintiffs and their Decedent to ensure that the Panera Charged Lemonade was fit for its ordinary uses and reasonable expectations of the safety of lemonade at a restaurant like Panera Bread, including as a safe beverage, and as stated herein.

130.     Defendants breached their duty to Plaintiffs and their Decedent to ensure that the Panera Charged Lemonade was fit for its intended purposes, including as a safe beverage, and as stated herein.

131.      Panera Charged Lemonade was not fit for its ordinary uses or intended purposes, as stated herein.

132.     Panera Charged Lemonade does not conform to these implied representations of safety because it contains an exorbitant amount of caffeine content and stimulants causing cardiac arrhythmias and other cardiac-related injuries, especially in a vulnerable population, children, pregnant and breastfeeding women, and caffeine-sensitive individuals.

133.     Defendants breached their implied warranties to the consuming public, including, but not limited to, Sarah Katz.

134.     Defendants sold the Panera Charged Lemonade with the implied warranty that it was safe to consume by members of the public by not warning of its dangers, having it be readily accessible to all consumers to fill and refill, and having it be part of their Sip Club membership, including but not limited to, Sarah Katz.

135.     Sarah Katz reasonably and justifiably relied on Defendants' representations that the Charged Lemonade was safe to consume.

24

136.     As a direct and proximate result of Defendants' breach of the implied warranties, Sarah Katz suffered the injuries and damages set forth herein, entitling Plaintiffs to damages.

137.     At all times, Defendants knew or should have known that there was a high degree of probability of harm to Sarah Katz and acted with a reckless indifference to the potential and foreseeable consequences of Defendants' defective product.

138.     At all times, Defendants knew or should have known of the serious harm that could result from their conduct.

139.     Defendants knew or should have known, or recklessly disregarded, the likelihood that such serious harm would arise from their conduct.

**WHEREFORE**, Plaintiffs respectfully request judgment in their favor and against Defendants, jointly and severally, including claims for compensatory damages, punitive damages, interest, costs of suit, and such other relief as this Honorable Court may deem appropriate and just.

<u>**COUNT V – WRONGFUL DEATH**</u>
**PLAINTIFFS V. ALL DEFENDANTS**

140.     Plaintiffs incorporate by reference all the above paragraphs as though set forth fully herein.

141.     As Administrators of the estate of Decedent, Plaintiffs file this Wrongful Death Action pursuant to 42 Pa. C.S.A. §8301 *et seq.*

142.     As Administrators of the estate of Decedent, Plaintiffs assert and claim all damages as set forth in the Wrongful Death Act and supporting case law.

143.     The beneficiaries under the Wrongful Death Act are Decedent's father and mother, Jill and Michael Katz.

**WHEREFORE**, Plaintiffs respectfully request judgment in their favor and against Defendants, jointly and severally, including claims for compensatory damages, punitive damages, interest, costs of suit, and such other relief as this Honorable Court may deem appropriate and just.

## <u>COUNT VI – SURVIVAL ACTION</u>
### PLAINTIFFS V. ALL DEFENDANTS

144.    Plaintiffs incorporate by reference all the above paragraphs as though set forth fully herein.

145.    As Administrators of the estate of Decedent, Plaintiffs bring this action on behalf of their daughter's estate in accordance with the Survival Act of the Commonwealth of Pennsylvania, 42 Pa. C.S.A. §8302 *et seq.*

146.    As Administrators of the estate of Decedent, Plaintiffs assert and claim all damages as set forth in the Survival Act and supporting case law.

**WHEREFORE**, Plaintiffs respectfully request judgment in their favor and against Defendants, jointly and severally, including claims for compensatory damages, punitive damages, interest, costs of suit, and such other relief as this Honorable Court may deem appropriate and just.

Respectfully Submitted,

**KLINE & SPECTER, P.C**

By:    */s/ Elizabeth A. Crawford, Esquire*
Thomas R. Kline, Esquire
Elizabeth A. Crawford, Esquire
Michelle A. Paznokas, Esquire
*Attorneys for Plaintiffs*